UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RODNEY GONZALEZ,

    Plaintiff,

v.                Case No. 17-C-670

NANCY A. BERRYHILL,

    Defendant.

---

**DECISION AND ORDER AFFIRMING COMMISSIONER'S DECISION**

---

  This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Rodney Gonzalez' application for supplemental security income (SSI) under Title XVI of the Social Security Act. Gonzalez challenges the decision by the Administrative Law Judge (ALJ) denying him benefits because the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Gonzalez contends that the ALJ erred by failing to properly weigh the various medical opinions and to adequately encapsulate Gonzalez' limitations in concentration, persistence, and pace (CPP) in the hypothetical question to the vocational expert (VE). For the reasons stated in this opinion, the Commissioner's decision will be affirmed.

## BACKGROUND

  On December 17, 2012, Gonzalez, age 41 at the time, completed an application for SSI with his alleged disability beginning November 28, 2010. R. 181. He listed bipolar, post-traumatic stress disorder (PTSD), anxiety, depression, and panic disorder as the conditions that limited his ability to work. R. 216. At the time he submitted his application, he was 6'1" and weighed 230 pounds. *Id.* Following the denial of his application initially and on reconsideration, Gonzalez requested a hearing

before an ALJ. ALJ Edward P. Studzinski conducted a hearing on July 31, 2015. Gonzalez, who was represented by counsel, and a VE testified. R. 45–97.

At the time of the hearing, Gonzalez lived in a house with his fiancé and three dogs. R. 76. He testified that he completed the sixth grade and was suspended from school in seventh grade after hitting a teacher. He then worked as a laborer for different employers. R. 50–51. He testified that he was fired from one of these jobs but left the others after a short period of time due to knee and shoulder pain. Gonzalez identified depression, bipolar disorder, anxiety, panic disorder, knee pain, right shoulder pain, and left shoulder pain as his medically determinable severe impairments. R. 49. While Gonzalez testified that he had surgery on his shoulder and right knee, his knee surgery is not documented in the medical record. R. 62, 70. He reported that he could only lift ten pounds, sit for forty-five to sixty minutes, stand for fifteen to twenty minutes before his knees begin hurting, and walk one block. R. 77–78.

As to his mental impairments, Gonzalez claimed that he has both depressive and manic phases of bipolar disorder. R. 64. Treatment records indicate that, upon his release from prison, Gonzalez began experiencing social anxiety. He reported perpetual paranoia of the Latin Kings, a gang he was a member of when he was younger, and as a result of his social anxiety, he keeps his back to the wall, is easily irritated, feels angry, and feels like people are following him. R. 320, 329, 463. Gonzalez indicated that he also has problems with blacking out, violence, anger, flashbacks, and hallucinations. In particular, Gonzalez claimed that he hears voices that tell him to hurt people. R. 66, 72. He testified that he also has anxiety manifested by daily panic attacks that last a couple of hours and has crying spells but does not cry. R. 68–69. Gonzalez noted that he does not sleep

2

often, and treatment records indicate that he smokes marijuana daily to help him sleep. Gonzalez testified that his doctors prescribed a number of medications that were not helpful. R. 65.

Gonzalez also testified about his average day. He reported that he has rarely left his house in the last four years, and the only time he leaves the house is to attend doctor appointments. R. 67, 73. He testified that he does not have any hobbies and does not own a computer. During the day, he watches televison and tries to read the newspaper. R. 71. Although he initially testified that he does not cook, clean, do yard work, shop, or handle money, he later testified that he would go to the grocery store with his girlfriend, walk his dogs, and exercise at the gym. R.70–71, 74. He stated that he drives to his appointments if his fiancé cannot take him. R. 75.

In a written decision dated September 17, 2015, the ALJ concluded Gonzalez was not disabled. R. 24–39. Following the agency's five-step sequential evaluation process, the ALJ concluded at step one that Gonzalez had not engaged in substantial gainful activity since December 17, 2012. R. 26. At step two, the ALJ found Gonzalez had the following severe impairments: bilateral shoulder and right knee degenerative joint disease, anxiety, as well as affective and personality disorders. *Id.* At step three, the ALJ determined Gonzalez' impairments or combination of impairments did not meet or medically equal any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After reviewing the record, the ALJ concluded Gonzalez has the residual functional capacity (RFC) to

> lift [and/or] carry up to 20 pounds occasionally and 10 pounds frequently with no limitations in the total amount of time he is able to sit, stand, or walk throughout an 8-hour workday. The claimant could sit for 60 continuous minutes. He could frequently push and pull with his upper extremities, and could frequently operate foot controls. The claimant could occasionally climb ramps and stairs, kneel, crouch, and

crawl, but he could never climb ladders, ropes, or scaffolds. He could never reach overhead with either arm, and could frequently but not repetitively reach in all other directions. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and he should avoid concentrated exposure to unguarded hazardous machinery. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He is further precluded from work involving direct public service, in person or over the phone, although the claimant could tolerate brief and superficial interaction with the public, which is incidental to his primary job duties. He is unable to work in crowded, hectic environments. The claimant could tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem-oriented tasks.

R. 29. With these limitations, the ALJ found at step four that Gonzalez is unable to perform his past work as a material handler. R. 36–37. He nevertheless found at step five that there are jobs that exist in significant numbers in the national economy that Gonzalez can perform, such as a small products assembler, final assembler, inspector, checker, weigher, and machine tender. R. 37–38. Based on these findings, the ALJ concluded Gonzalez was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Gonzalez' request for review. Thereafter, Gonzalez commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence,

remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**I. Assessment of Medical Evidence**

Gonzalez argues that the ALJ improperly evaluated the opinions of Dr. Patel, his treating physician; Dr. Schedgick, a psychological consultative examiner; Kathleen Ludwikowski, a psychiatric nurse practitioner; and Sally Lichterman, a nurse practitioner. As a consequence of this error, Gonzalez contends the ALJ improperly weighed the opinions of the state agency reviewing physicians.

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R.

5

§ 416.927(c)(2); SSR 96–2p; *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson*, 615 F.3d at 749. Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy*, 705 F.3d at 636 (citations omitted). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The same or similar factors are used to assess other medical opinions offered in the case. *See* 20 C.F.R. § 416.913(d).

Dr. Patel, Gonzalez' treating psychiatrist, completed a mental opinion work-related limitations statement and listing on May 12, 2015, at the request of Gonzalez' counsel. R. 458–64. She noted that Gonzalez' impairments, symptoms, and limitations have lasted for several years. R. 463. She opined that he would be off task more than 30% of the day and would be absent from work and unable to complete an 8-hour work day five or more days because he would quit his job at the first conflict. R. 460. Dr. Patel observed that Gonzalez is pretty functional within his home setting but may have problems with authority. She believed that Gonzalez would be unable to obtain or retain work in a competitive work setting for a continuous period of at least six months. R. 461.

The ALJ sufficiently articulated his reasons for not giving Dr. Patel's opinion controlling weight. First, the ALJ correctly labeled Dr. Patel's opinion that Gonzalez would be unable to sustain work on a regular and routine basis because he will likely quit the job at the first conflict as a determination reserved to the Commissioner. R. 36. The regulations reserve to the Commissioner

"the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)). Indeed, the fact that a treating physician intrudes on an issue reserved to the Commissioner is not a reason to disregard the opinion entirely. *Id.* But the ALJ did not disregard Dr. Patel's opinion. Instead, the ALJ concluded Dr. Patel's opinion was inconsistent within itself and the overall record. The ALJ noted that Dr. Patel found that Gonzalez' anxiety-related disorder rendered him completely unable to function outside his home, but also observed that Gonzalez regularly goes to the gym and out for walks. Dr. Patel also noted that Gonzalez had these limitations for "several years," even though Gonzalez had worked and acknowledged that he submitted two job applications to various employers each week. In addition, Dr. Patel observed that Gonzalez did not appear committed toward treatment or the medications she suggested, seemed to have a fixed mind about what he should be taking, and appeared relaxed and pleasant at his most recent appointment. The ALJ also found that Dr. Patel did not allude to any specific objective clinical findings to support the conclusions.

Gonzalez argues that the ALJ's analysis improperly "cherry-picked" evidence from the record and overlooked the substantial evidence showing his impairments. But none of the evidence Gonzalez cites refutes the ALJ's determination that Dr. Patel's extreme limitations found no support in the medical evidence. Dr. Patel did not provide a citation to any treatment notes that supported her extreme limitations. The ALJ rightly noted that Dr. Patel's opinions were not well supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial evidence, including her own treatment notes. For these reasons, the ALJ was not bound by Dr. Patel's opinion.

Gonzalez next claims that the ALJ erred in his evaluation of the opinion of Dr. Schedgick, a psychologist who evaluated Gonzalez in April 2013 at the request of the Disability Determination Bureau. R. 354–69. Gonzalez presented to the appointment angry and hostile and could not assure Dr. Schedgick that he would not hurt him. R. 356. Dr. Schedgick indicated he would "reserve judgment about whether this individual is putting forth an adequate amount of effort" in learning and memory tests. R. 359. He noted that when asked to complete a serial 7 and serial 3 task, Gonzalez said he could not complete either task. Gonzalez said he could not remember any of the objects in a delayed memory test, took 35 seconds to say the alphabet correctly, and took six seconds to incorrectly spell "world." R. 358–59. As to orientation, Gonzalez did not know the date, said the last major holiday was Easter and the next one is "nothing," and did not know the current president or any states that boarder Wisconsin. R. 359. Dr. Schedgick decided to "reserve judgment about this individual's intellectual skills," as it appeared Gonzalez did not put forth adequate effort and this "may not be his best performance." *Id.* He believed Gonzalez' motivational level may be very low and he may be trying to appear at a much lower level of functioning than he is actually able to perform at. R. 360. He did not want to press Gonzalez for answers because Gonzalez openly admitted that he could be dangerous. R. 359. Dr. Schedgick noticed Gonzalez showed some behavioral indications of anxiety, such as constant leg and foot movement. R. 360. He assessed a GAF score of 40 to 50 due to Gonzalez' level of aggression. R. 368. Dr. Schedgick opined that Gonzalez would have problems following a schedule and routine because of his personality features and his ability to work would also be impacted by his personality features. He noted Gonzalez "probably can" understand, remember, and carry out instructions adequately. Dr. Schedgick concluded Gonzalez may or may not be able to tend to a job. R. 369.

The ALJ accorded little weight to Dr. Schedgick's opinion based on his own report that he was unable to accurately assess Gonzalez' mental functional capacity. He indicated that Dr. Schedgick noted that Gonzalez was not putting forth an adequate amount of effort. Indeed, Gonzalez seemed to be intentionally unresponsive to Dr. Schedgick's questions. Dr. Schedgick stated that he did not want to press Gonzalez further because he was afraid that Gonzalez would become dangerous. The ALJ also noted Gonzalez made several contradictory statements throughout the examination. R. 32.

Gonzalez asserts that the ALJ erred in failing to address the GAF score of 40–50 Dr. Schedgick assessed. But "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003)); *see also Bates v. Colvin*, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013) ("[A] low GAF score alone is insufficient to overturn the ALJ's finding of no disability." (citation omitted)). The Seventh Circuit has found that it is not improper for an ALJ to rely upon a psychologist's "narrative finding" that the plaintiff has "no significant mental impairments," rather than the "unexplained numerical [GAF] score" assigned by the psychologist. *Id.* In this case, the ALJ's failure to mention the GAF score is not indicative of an ALJ cherry-picking the record. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("[T]he problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."). Instead, the ALJ relied on the narrative portion of Dr. Schedgick's evaluation in assessing Gonzalez' RFC.

9

Gonzalez further argues that the ALJ erred in failing to discuss certain findings regarding his anger that would support a finding of disability. ECF No. 13 at 21. But Dr. Schedgick's findings that Gonzalez' "personality make-up . . . could make him extremely dangerous" and that he is "obnoxious," "disruptive," and "angry" do not give the impression that these attributes prevent him from working, as Gonzalez suggests. Although Gonzalez' personality features may make it difficult for him to make appropriate choices in the workplace, it is not impossible or unlikely. Dr. Schedgick explained that even with Gonzalez' limitations relating to his personality features and anxiety, he may have the ability to succeed in the workplace. The ALJ accommodated Dr. Schedgick's findings of anxiety into the section of the RFC concerning Gonzalez' ability to deal with stress and social interactions. R. 32. Accordingly, the ALJ did not err in affording little weight to Dr. Schedgick's opinion.

Gonzalez further asserts that the ALJ erred in his evaluation of two nurse practitioners. The regulations in force at the time Gonzalez filed his claim separated medical evidence into two categories: "acceptable medical sources" and "other sources." Acceptable medical sources are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists, 20 C.F.R. § 404.1513(a), while other sources include medical sources, such as nurse practitioners, social workers, and therapists, as well as non-medical sources, such as educational personnel and relatives. 20 C.F.R. § 404.1513(d). Although only "acceptable medical sources" can give medical opinions and be considered treating sources under the previous regulations, an ALJ may rely on opinions from other medical sources to determine the severity of the claimant's impairments and the extent of any limitation on the claimant's ability to work. *Id.* In deciding how much weight to give these "other sources," an ALJ

can apply the same kinds of factors that are used to evaluate acceptable medical sources. SSR 06-03p. SSR 06-03p states that "the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

As an initial matter, Psychiatric Nurse Practitioner Kathleen Ludwikowski did not offer any opinion on whether Gonzalez was capable of work or what his functional limitations actually were. Gonzalez concedes that her "opinion" offers little to the overall case. ECF No. 13 at 16. At most, Ludwikowski indicated that Gonzalez' short-term memory is impacted by his illness and that he does not take the recommended dose of his medication. R. 371. She noted that she did not know if Gonzalez could understand, carry out, or remember instructions; respond appropriately to supervisors or coworkers; or respond appropriately to routine work pressures and changes in a work setting. R. 373. In short, Ludwikowski did not offer any opinion about what Gonzalez could do or not do in a work setting. The ALJ reasonably afforded her statement little weight because she did not provide an opinion as to the severity or duration of Gonzalez' mental impairments, she is not considered an acceptable medical source, and she did not have a longitudinal treatment relationship with Gonzalez. The ALJ provided "an accurate and logical bridge" between the evidence and his conclusions. *Roddy*, 705 F.3d at 636.

The ALJ also declined to give substantial weight to the opinion of Nurse Practitioner Sally Lichterman. Lichterman completed a mental opinion work-related limitations statement and listing on May 12, 2015, at the request of Gonzalez' counsel. R. 405–11. She noted that she discharged Gonzalez from treatment on May 1, 2015 due to non-attendance. R. 405. She stated that Gonzalez

11

struggles with social anxiety and PTSD and that these diagnoses affect his everyday functioning. R. 411. Lichterman opined that Gonzalez would be off task for more than 30% of the day and would be absent from work and unable to complete an 8-hour work day five or more days and noted Gonzalez self-reported a GAF score of 40. R. 407–08. She indicated Gonzalez had marked restrictions in his activities of daily living; extreme limitations in maintaining social functioning and concentration, persistence, or pace; and three episodes of decompensation within a 12-month period. R. 409. Lichterman believed Gonzalez would be unable to obtain or retain work in a competitive work setting for a continuous period of at least six months. R. 408.

Gonzalez asserts that the ALJ did not evaluate Lichterman's opinion under the regulatory factors. ECF No. 13 at 18. Yet, the ALJ did consider Lichterman's opinion and provided sound reasons for rejecting it. As the ALJ noted, Lichterman had a limited treatment relationship with Gonzalez. The ALJ further indicated that Lichterman's opinion is inconsistent with the longitudinal record, reasoning that Gonzalez has been non-compliant with his psychotropic medications, has demonstrated poor motivational level, and has showed poor effort upon mental status examination, in addition to the fact that Gonzalez was discharged from Lichterman's care due to non-attendance. R. 35–36. These are proper reasons for discounting Lichterman's opinions, as nothing in the medical evidence warranted the highly restrictive limitations assessed by Lichterman.

Gonzalez also contends that the ALJ erred in finding that Lichterman's opinion was based solely on his self-reports. In addition to being inconsistent with the overall record, the ALJ offered as a reason for discounting Lichterman's opinions the fact that the GAF score of 40 noted in Lichterman's questionnaire was based on Gonzalez' self-reporting and not her own objective, clinical findings. The Seventh Circuit has recognized that subjective reports to a medical source are "the

12

opposite of objective medical evidence and an ALJ is not compelled to accept them." *Schaaf*, 602 F.3d at 875. In sum, the ALJ did not err in assessing the weight of this opinion.

Finally, Gonzalez asserts that, because the ALJ failed to properly weigh the opinions of these medical sources, he erred by giving more weight to the state agency psychologists. An ALJ can give weight to state agency psychologist opinions only insofar as they are supported by the evidence of the entire case record. SSR 96-6p. Dr. Kenneth Clark and Dr. Ellen Rozenfeld concluded Gonzalez was capable of performing heavy work. The ALJ explained that he gave great weight to these opinions because they are consistent with the overall evidence, including the results of Gonzalez' examinations and his daily activities. He also noted that state agency consultants are "highly qualified physicians and psychologists, who are experts in the evaluation of medical issues in disability claims under the Act." R. 34. In sum, the ALJ gave logical reasons for the weights he accorded the various medical opinions, and the evaluation of the medical evidence was not unreasonable.

**II. RFC**

Gonzalez next challenges the ALJ's assessment of his RFC. A claimant's RFC specifies the most that a claimant can do despite the physical or mental limitations imposed by his impairments. 20 C.F.R. § 404.1545(a)(1). An ALJ assesses a claimant's RFC "based on all the relevant evidence" in the case record, including severe and non-severe impairments as well as medical and non-medical evidence. *Id.* § 404.1545(e). The ALJ's hypothetical question to the VE must then incorporate all of the limitations included in the RFC. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Although the SSA must consider

13

opinions from medical sources, the "final responsibility" for determining a claimant's RFC is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2).

Gonzalez claims the ALJ erred in failing to fully inform the VE of his moderate limitations in CPP. State agency consultant Dr. Kenneth Clark opined that Gonzalez had moderate limitations in his ability to work in coordination with or in proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He elaborated that Gonzalez' anxiety and depression symptoms limit his ability to work well with people unfamiliar to him and that his personality disorder limits his ability to relate to other people. He noted further that Gonzalez should be limited to work environments that require no more than occasional contact with the general public. R. 109. Despite these limitations in mental function, Dr. Clark concluded that Gonzalez could meet the basic demands of heavy work. R. 111.

State agency consultant Dr. Ellen Rozenfeld opined that Gonzalez has sustained concentration and persistence limitations, noting that he is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or in proximity to others without being distracted by them. She explained that Gonzalez' anxiety and depression symptoms limit his ability to work well with people unfamiliar with him and limited him to work environments that require no more than occasional contact with others. She opined that he would do best in a work setting that is limited to tasks of a simple and routine nature. R. 119. Dr. Rozenfeld also concluded that he has social interaction limitations, finding that he is moderately limited in his ability to interact appropriately with the general public, to accept

14

instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 119–20. Finally, Dr. Rozenfeld concluded he has adaptation limitations, noting that he is moderately limited in his ability to respond appropriately to changes in the work setting. R. 120. She elaborated that Gonzalez' ability to handle stress and changes in the workplace would be reduced but adequate to tolerate minor changes in routine. Overall, Dr. Rozenfeld concluded that, "from a psychological perspective, [Gonzalez] retains the ability to perform simple repetitive tasks on a sustained basis in a work setting with only occasional/causal contact with others and routine work place changes." *Id.* She also opined that Gonzalez was capable of performing heavy work. R. 121.

Gonzalez asserts that the ALJ's hypothetical question and RFC failed to encapsulate the state agency physicians' findings. Under Seventh Circuit precedent, it is well-established that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)). In particular, the Seventh Circuit has found fault when the ALJ translates a finding of moderate limitations in CPP into an RFC limiting the plaintiff to simple, routine, and repetitive tasks. *See O'Connor–Spinner*, 627 F.3d at 620 (rejecting argument that "an ALJ may account generally for moderate limitations on concentration, persistence or pace by restricting the hypothetical to unskilled work"). But where a medical source, whose opinion the ALJ reasonably accords great weight, translates his own findings that the claimant may have moderate difficulties in CPP into an ultimate conclusion that the claimant can nevertheless perform simple, routine, and repetitive work, the ALJ does not err. Thus, in *Johansen v. Barnhart*, the court held that the ALJ did not err in finding that, despite the plaintiff's moderate limitations in

15

his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without simple interruptions from psychologically-based symptoms, he could still perform repetitive, low-stress work:

> The ALJ did not err in relying on Dr. Matkom's assessment of Johansen's mental RFC. Both Dr. Matkom and Dr. Berney found that Johansen was essentially "moderately limited" in his ability to maintain a regular schedule and attendance, and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. Dr. Matkom, however, went further and translated those findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work. Dr. Berney, on the other hand, did not make an RFC assessment (nor did state-agency physician Ingison). Thus, because Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to Goldsmith.

314 F.3d 283, 288–89 (7th Cir. 2002).

Here, although the mental health consultants opined that Gonzalez had some limitations, none of them found that Gonzalez lacked the capacity to perform the tasks needed for the RFC formulated by the ALJ. To repeat, Dr. Clark noted Gonzalez' anxiety and depression symptoms limit his ability to work well with people unfamiliar to him and that his personality disorder limits his ability to relate to other people. He opined that Gonzalez should be limited to work environments that require no more than occasional contact with the general public. R. 109. Dr. Rozenfeld concluded that, "from a psychological perspective, [Gonzalez] retains the ability to perform simple, repetitive tasks on a sustained basis in a work setting only with occasional/causal contact with others and routine work place changes." R. 120. The RFC determined by the ALJ reasonably captured the limitations the consultants identified by limiting Gonzalez to "simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He is further precluded from work involving direct

16

public service, in person or over the phone, although the claimant could tolerate brief and superficial interaction with the public, which is incidental to his primary job duties. He is unable to work in crowded, hectic environments. The claimant could tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem-oriented tasks." R. 29. In short, the ALJ reasonably captured the limitations found by the state agency physicians.

After all, a claimant's RFC is "the most [the plaintiff] can still do despite [the plaintiff's] limitations," 20 C.F.R. § 404.1545(a)(1), not what he can still do with ease or without moderate difficulty. This is particularly important to note when one considers what the term "moderate" is intended to mean in this context. The recent rule revisions by the SSA clarify that a "moderate" limitation means that a plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." SSA, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164 (Sept. 26, 2016) (effective January 17, 2017). Although the revised regulations were not in effect at the time the hearing was held in this case, the definitions "are consistent with how [the SSA's] adjudicators have understood and used those words in [the SSA's] program since [the SSA] first introduced the rating scale in 1985." *Id.* at 66147. As a result, the definitions set forth in the new rules "do not represent a departure from prior policy." *Id.*; *see also Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) ("A moderate limitation is not a complete impairment." (citing *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007))). Thus, moderate difficulty does not mean that the claimant is unable to perform the activity or task. I find no error in the ALJ's consideration of the limiting effects of Gonzalez' impairments.

Finally, and as perhaps more of an aside, I note that this case reflects a fundamental problem with the SSA's disability program, particularly in the area of alleged mental impairments. That

problem is the assumption that a claimant's description of how he *feels* and what he *does* and *does not do*, when provided to health care professionals with an M.D. or Ph.D. after their names, somehow takes on the weight of a medical opinion as to what the claimant *can* and *cannot do*. This behavioristic understanding of the human person is inconsistent with the notion of individual freedom that underlies our law more generally. It also ignores human nature and risks undermining the adjudicative process as the fact finder's role is abdicated to the presumed experts.

## CONCLUSION

For the above reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   24th   day of September, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court